**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JOHN A. ALBANESE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1425 GMS |
| | ) | |
| v. | ) | Trial by Jury Demanded |
| | ) | |
| THE CITY OF WILMINGTON, DELAWARE, | ) | |
| A Political Subdivision of the State of Delaware, | ) | |
| JAMES N. MOSLEY, SR., and | ) | |
| JEFFREY J. STARKEY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Andrea J. Faraone, Esquire (I.D. #3831)
Assistant City Solicitor
City of Wilmington Law Department
800 N. French Street, 9th Floor
Wilmington, DE 19801

Dated:  February 28, 2006

## TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF
        CANNOT ESTABLISH A PRIMA FACIE CASE OF REVERSE RACIAL DISCRIMINATION
        UNDER TITLE VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.     Standard Applicable in Reverse Discrimination Cases . . . . . . . . . . . . . . . . . . . . . . . 23

        B.     Plaintiff Cannot Demonstrate that Similarly Situated Minorities Were Treated More
               Favorably . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        C.     Plaintiff Cannot Demonstrate that He Was Qualified for the Position of Housing Code
               Enforcement Supervisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        D.     Plaintiff Cannot Establish Any Causal Connection Between His Race and the Actions
               Taken by Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY HAD
        LEGITIMATE, NON-DISCRIMINATORY AND NON-PRETEXTUAL REASONS FOR ALL
        OF THEIR EMPLOYMENT DECISIONS REGARDING PLAINTIFF . . . . . . . . . . . . . . . . . 36

IV.     DEFENDANTS MOSLEY AND STARKEY ARE ENTITLED TO SUMMARY JUDGMENT
        BECAUSE THEY CANNOT BE HELD LIABLE FOR VIOLATIONS OF TITLE VII IN THEIR
        INDIVIDUAL CAPACITIES AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM
        FOR PUNITIVE DAMAGES BECAUSE PUNITIVE DAMAGES ARE NOT AVAILABLE
        AGAINST A MUNICIPALITY UNDER TITLE VII AS A MATTER OF LAW . . . . . . . . . . 39

VI.     PLAINTIFF'S DAMAGES, IF ANY, ARE LIMITED TO A MAXIMUM OF $300,000 . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF CITATIONS

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Arnold Pontiac-GMC, Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir. 1986) . . . . . . . . . . . . . . 22

*Blackshear v. Wilmington*, 15 F.Supp.2d 417 (D. Del. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Big Apple BMW, Inc., et.al v. BMW of North America, Inc.*, et. al, 974 F.2d 1358 (3d Cir. 1992) . . . . . 22

*Boggs v. Commonwealth of Kentucky*, 1996 U.S. App. LEXIS 30332 (6th Cir. Nov. 20, 1996) . . . . . . . .

*Carrigan v. State*, 957 F. Supp. 1376 (D. Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert denied*, 484 U.S. 1066 (1988) . . . . . . . . . . . . . . . 22

*Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 39

*Kansas City Cable Partners ex rel. Time Warner Entertainment Co., L.P. v. Espy*,
250 F.Supp.2d 1296 (D. Kan. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Lamb-Bowman v. Delaware State Univ.*, 152 F.Supp.2d 553 (D. Del. 2001) . . . . . . . . . . . . . . . . . . . 23

*Matsushita Electric Industries Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . . . 22

*McIntyre v. Wilmington*, C.A. No. 01-396-GMS, Sleet, J. (D. Del. July 9, 2002) . . . . . . . . . . . . . 25, 32

*Medcalf v. Trustees of Univ. of Pennsylvania*, 71 Fed. Appx. 924 (3d Cir. July 30, 2003) . . . . . . . 23, 24

*Messina v. E.I. DuPont de Nemours & Co.*, 308 F.Supp.2d 491 (D. Del. 2004) . . . . . . . . . . . . . . . . . 28

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rennie v. Dalton*, 3 F.3d 1100 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Sarullo v. United States Postal Service*, 352 F.3d 789 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . 31, 32, 34

*Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061(3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . 39

*Taylor v. Potter*, 2004 U.S. Dist. LEXIS 16629 (D. Del.  Aug. 18, 2004) . . . . . . . . . . . . . . . . . . . 25, 32

*Tehee v. Bd. of Educ.*, 1997 U.S. App. LEXIS 13898 (9th Cir. Jun. 10, 1997) . . . . . . . . . . . . . . . . 32, 34

*Walsh v. McCain Foods, Ltd.*, 81 F.3d 722 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Wayne v. West Chester*, 891 F.2d 458 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## **STATUTES**

42 *U.S.C.* § 1981a(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

42 *U.S.C.* § 1981a(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

42 *U.S.C.* § 1981a(b)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1 *Wilm. C.* § 40-81(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1 *Wilm. C.*§ 40-128(2)a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 18, 19, 20, 21, 31, 36, 37

1 *Wilm. C.*§ 40-221(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13, 14, 15, 16, 30

1 *Wilm. C.*§ 40-223(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1 *Wilm. C.*§ 40-226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13, 15, 16, 19, 30

## **RULES**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Civ. P. 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## NATURE AND STAGE OF THE PROCEEDINGS

On November 4, 2004, Plaintiff John A. Albanese, Jr., filed a Complaint against Defendants, the City of Wilmington, James N. Mosley, Sr., and Jeffrey J. Starkey in the United States District Court for the District of Delaware. *See* A-217-26. The Complaint asserted claims for racial discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 and the Civil Rights Act of 1991 (hereinafter "Title VII"). *See id.* On December 23, 2004, Defendants filed an Answer to the Complaint. *See* A-209-16.

Plaintiff was initially represented in this action by Thomas C. Marconi, Esquire. Mr. Marconi filed a motion to withraw as Plaintiff's counsel on June 8, 2005, which the Court granted on July 13, 2005. *See* A-1-2; A-3-9. In its Order granting Mr. Marconi's motion to withdraw, the Court gave the Plaintiff thirty (30) days, until August 13, 2005, to cause substitute counsel to enter an appearance on his behalf. *See* A-1.

Before Mr. Marconi moved to withdraw as Plaintiff's counsel, Defendants had served him with their First Request for Admissions. Plaintiff's responses to those requests for admissions were originally due on May 18, 2005. *See* A-208. Upon learning of Mr. Marconi's intent to move to withdraw as counsel, Defendants' counsel agreed to give Plaintiff an extension for responding to the requests for admissions and Defendants' other outstanding discovery requests until forty-five (45) days after the deadline set by the Court for the Plaintiff to cause substitute counsel to enter an appearance on his behalf. Pursuant to that extension, Plaintiff's responses to Defendants' requests for admissions were due on September 27, 2005. To date, Plaintiff has not yet responded to Defendants' First Request for Admissions. Therefore, the matters set forth in those requests for admissions should be deemed admitted pursuant to Fed.R.Civ.P. 36(a). *See also Walsh v. McCain Foods, Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996); *Kansas City Cable Partners ex rel. Time Warner Entertainment Co., L.P. v. Espy*, 250 F.Supp.2d 1296, 1297-99 (D. Kan. 2003).

Defendants filed a Motion for Summary Judgment on February 28, 2006, after the close of discovery. This is Defendants' Opening Brief in support of that motion.

## SUMMARY OF ARGUMENT

1.      Defendants are entitled to summary judgment because Plaintiff cannot establish a prima facie case of reverse racial discrimination under Title VII.  One of the necessary elements of a prima facie case of reverse racial discrimination is that the plaintiff was treated less favorably than similarly situated minorities.  Plaintiff cannot establish a prima facie case of reverse discrimination because he cannot demonstrate that he was treated less favorably than any similarly situated minorities.

2.      Similarly situated Hispanic and African American housing code inspectors and supervisors were offered the same training as Plaintiff; had the same number of opportunities to take the Property Maintenance and Housing Inspection examination; were given the same amount of time as Plaintiff to prepare for and pass that examination; and like Plaintiff, had their employment terminated if they failed to obtain the required BOCA certification within the longer of one year from when they were notified in July 2000 of the change in certification requirements for housing code inspectors and supervisors from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection, or one year after they became permanent employees in their current positions.  Additionally, on several occasions, other positions have been re-posted pursuant to City Code § 40-128(2)(a) after Black or Hispanic employees were certified as eligible for those positions.

3.      Juan Diaz and Arthur Walker were not similarly situated to the Plaintiff because Diaz was a building code inspector and Walker was a building code supervisor.  Diaz and Walker were, therefore, subject to different BOCA certifications requirements and deadlines than Plaintiff, who was a housing code supervisor.  They also received certain extensions of their certification deadlines for reasons that did not apply to the Plaintiff.  Unlike housing code inspectors and supervisors, who were required to obtain BOCA certification in Property Maintenance and Housing Inspection, building code inspectors and supervisors were required to obtain three different BOCA certifications: (1) 1 & 2 Family Dwelling Inspection, (2) Building General, and (3) Fire Protection General.  Due to the greater number and difficulty of their required BOCA

examinations, building code inspectors and supervisors were given a longer period than housing code inspectors and supervisors to obtain the required BOCA certifications. Mr. Diaz and Mr. Walker were given extensions of their certification deadlines which were necessitated by the temporary unavailability of one of their examinations and a delay in providing them with essential study materials for the General Fire Protection examination. Plaintiff was not given these same extensions because he was not affected by the circumstances which created the need for the extensions, as he did not have to take any of the same BOCA examinations as Mr. Walker and Mr. Diaz.

4.     Another essential element of a prima facie case of employment discrimination under Title VII is that the Plaintiff was qualified for the position in question. Plaintiff cannot establish a prima facie case of racial discrimination under Title VII because he cannot demonstrate that he was qualified for the position of Housing Code Enforcement Supervisor. Plaintiff's employment was terminated in July 2001 because of his failure to meet one of the essential qualifications for the Housing Code Enforcement Supervisor position – BOCA certification in Property Maintenance and Housing Inspection within the longer of one year after becoming a permanent employee in that position, or one year after being notified of the change in BOCA certification requirements from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection. When Plaintiff re-applied for the Housing Code Enforcement Supervisor position in August 2001, he had already failed to meet that essential requirement for the position. He had not cured the deficiency in his qualifications by obtaining the required BOCA certification during the interim.

5.     To establish a prima facie case of Title VII racial discrimination, a plaintiff must also demonstrate a causal nexus between his race and the employment actions taken by the defendants. Plaintiff cannot establish a prima facie case of discrimination under Title VII because he cannot show any causal connection between his race and the actions taken by Defendants. The fact that similarly situated African American housing code inspectors and supervisors such as Dennis Porter and James Brown were also terminated for failure to obtain BOCA Property Mainenance and Housing Inspection certification by the

applicable deadline shows that Plaintiff's termination was not racially motivated. The Department's selection of Kevin Wilson, who was already BOCA certified in Property Maintenance and Housing Inspection, for the Housing Code Enforcement Supervisor position demonstrates that Defendants' refusal to rehire the Plaintiff for that position was not because of his race.

6.    Moreover, all of the employment actions taken with respect to the Plaintiff were directly and proximately caused by Plaintiff's own acts and omissions, namely: his failure to obtain BOCA Property Maintenance and Housing Inspection certification by the applicable deadline; his decision the take the Property Maintenance and Housing Inspection examination only twice, when he could have taken it up to four times; his decision to wait until shortly before his July 26, 2001 certification deadline expired to take that examination for the first time; his failure to devote sufficient time and effort to studying for the examination; his own choice not to take advantage of the training sessions provided by Trevor Knight after Mr. Knight had personally invited him to participate in them; and his failure to even attempt to cure the deficiencies in his qualifications by obtaining Property Maintenance and Housing Inspection certification after he was terminated from the Housing Code Enforcement Supervisor position.

7.    Even if Plaintiff were able to establish a prima facie case of discrimination, he cannot succeed on his Title VII claims because Defendants had legitimate, non-discriminatory and non-pretextual reasons for all of the employment decisions made with respect to Plaintiff. Defendants terminated Plaintiff's employment on July 26, 2001 because he had failed to obtain the required BOCA certification after being given over two years, including reasonable extensions, to do so. The fact that similarly situated African American housing code inspectors and supervisors were also terminated if they failed to obtain BOCA certification by the applicable deadline demonstrates that Defendants' termination of Plaintiff for failure to meet the BOCA certification requirement was neither racially motivated nor pretextual.

8.    Defendants also had legitimate, non-discriminatory and non-pretextual reasons for re-posting the Housing Code Enforcement Supervisor position after Plaintiff had re-applied for and was initially

recommended for that position.  Section 40-128(2)(a) of the applicable pre-2004 version of the City Code grants commissioners the discretion to order the re-posting of a position when there are fewer than three qualified candidates on the certification list.  Only two persons other than the Plaintiff applied for and were certified as eligible to be interviewed for the Housing Code Enforcement Supervisor position, and one of those candidates, James Rhodes, later withdrew from the selection process.  Commissioner Starkey decided to re-post the position so it could be advertised to reach a wider market of potential applicants, in an effort to find the person most qualified for the position.  This decision was a proper exercise of Commissioner Starkey's discretion pursuant to 1 *Wilm. C.* 40-128(2)(a) because there were fewer than three certified candidates for the position after Mr. Rhodes withdrew.

9.      The Department also had legitimate, non-discriminatory and non-pretextual reasons for awarding the Housing Code Enforcement Supervisor position to Kevin Wilson after the position was re-posted.  Mr. Wilson was clearly the person most qualified for the position.  He was the applicant with the highest overall score in the selection process, and he had already obtained BOCA certification in Property Maintenance and Housing Inspection.

10.      Plaintiff's lack of one of the essential qualifications for the Housing Code Enforcement Supervisor position – BOCA Property Maintenance and Housing Inspection Certification – was also a legitimate, non-discriminatory and non-pretextual reason for Defendants' decision to terminate and not re-hire the Plaintiff.  This qualification was required of all housing inspectors to protect the safety of the public and reduce the City's exposure to potential liability by ensuring that housing inspectors were familiar with applicable housing and sanitation standards and were, thus, competent to perform their job duties.

11.      Furthermore, if Defendants had re-hired Plaintiff for the Housing Code Enforcement Supervisor position after he had been terminated from that same position for failure to obtain Property Maintenance and Housing Inspection certification within the one year period allowed, it likely would have been viewed by other employees as a pretext for allowing Plaintiff to circumvent the BOCA certification

requirement. Defendants had legitimate reasons to be concerned that other employees might perceive them to be giving Plaintiff preferential treatment, because Arthur Walker later filed a charge of employment discrimination with the EEOC, alleging that Plaintiff was given more favorable treatment with respect to the BOCA certification requirement.

12.    Individual employees cannot be held liable under Title VII. Therefore, Defendants Mosley and Starkey cannot be held liable for Plaintiff's claims in their individual capacities as a matter of law.

13.    Punitive damages are not available against a municipality under Title VII as a matter of law. Therefore, Defendants are entitled to summary judgment on Plaintiff's claims for punitive damages.

14.    The maximum amount of damages that may be awarded in a Title VII employment discrimination case against an employer, such as the City, which has more than 500 employees is $300,000. Therefore, Plaintiff's damages, if any, must be limited to a maximum of $300,000 as a matter of law.

## STATEMENT OF FACTS

On March 22, 1999, Plaintiff was promoted to the position of Housing Code Enforcement Supervisor with the City's Department of Licenses and Inspections (the "Department"). *See* A-13, Req. 13; A-41; A-271-72, ¶ 8; A-277, ¶ 7. As a condition of his continuing employment in that position, Plaintiff was required to obtain Building Officials and Code Administrators International, Inc. ("BOCA") certification as a Property Maintenance and Housing Inspector by July 26, 2001. *See* A-14, Reqs. 19-20; A-50. Defendants terminated Plaintiff's employment with the City of Wilmington, effective July 27, 2001, for failure to obtain the required BOCA certification by the July 26, 2001 deadline. *See* A-15-16, Reqs. 31-32; A-52; A-54; A-250, ¶ 3. Plaintiff asserts that Defendants discriminated against him on the basis of his race in a number of ways. First, Plaintiff asserts that, unlike himself, African American and Hispanic employees of the Department who failed to obtain the required BOCA certification were not terminated. *See* A-223-24, ¶¶ 22-23. Second, Plaintiff claims he was given no training or other assistance in preparing for the BOCA examination, while certain African American employees of the Department were provided with tutoring. *See* A-220-22, ¶¶ 14,

16-18.  Third, Plaintiff asserts that he was given less time to prepare for and take the required BOCA examination than similarly situated Black and Hispanic employees.  *See* A-222-23, ¶¶ 20-21.  Fourth, Plaintiff contends he was given fewer opportunities to take the BOCA examination than similarly situated minorities. *See id.*  Finally, Plaintiff asserts that Defendants wrongfully refused to re-hire him as the Housing Code Enforcement Supervisor when he re-applied for that position in August 2001.  *See* A-225-26, ¶¶ 25-30.  All of Plaintiff's allegations of discrimination are completely unsupported by any evidence in the record.

Defendant James N. Mosley, Sr. was the Commissioner of the City's Department of Licenses and Inspections from November 5, 1998 to January 2, 2001.  *See* A-210, ¶ 6; A-269, ¶ 2.  Defendant Jeffrey J. Starkey was the Department's Deputy Commissioner from January 1999 to January 2, 2001, and has been the Commissioner of the Department since January 3, 2001.  *See* A-210, ¶ 7; A-275, ¶ 2.

When Defendant Mosley became the Commissioner of the Department in November 1998, he was surprised to learn that the Department had employees with no certifications or other credentials relating to building, housing or sanitation standards who were determining the habitability of housing and approving construction.  *See* A-269-70, ¶ 3.  He believed this may create a safety risk to the public, as well as a high risk of potential liability to the City.  *See id.*  To remedy this problem, in early 1999, the Department implemented a requirement that all newly hired building and housing inspectors obtain BOCA certification as a condition of their employment.  *See* A-275-76, ¶ 3. The purpose of this requirement was to establish objective criteria for determining whether persons hired as building and housing code inspectors were competent to perform their job duties.  *See* A-269-70, ¶ 3; A-275-76, ¶ 3.

When the Department first instituted the BOCA certification requirements, it required both building and housing inspectors and supervisors to obtain BOCA 1 & 2 Family Dwelling Inspection certification within one year of achieving permanent employee status in their current positions.  *See* A-12, Req. 6; A-270, ¶ 4; A-276, ¶ 4.  An employee achieves  permanent employee status upon successful completion of a

probationary period, which was usually 90 days long. *See* 1 *Wilm. C.* §§ 40-221(a), 40-223(a) and 40-226,

[1] A-240-41 ; A-270 ¶ 4; A-276, ¶ 4.

Many of the newly hired housing inspectors and supervisors who were subject to the BOCA certification requirement began complaining that the 1 & 2 Family Dwelling Inspection examination was too difficult and did not cover materials that were relevant to their job duties. A-270, ¶ 5; A-276, ¶ 5. Defendant Mosley, who was then Commissioner of the Department, therefore, instructed then Deputy Commissioner Defendant Starkey to research which BOCA certification was most appropriate for housing inspectors and supervisors. *Id.* Defendant Starkey consulted with BOCA Headquarters, and it recommended that the Department change the certification requirement for housing code inspectors and supervisors from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection. *Id.* BOCA Headquarters also recommended that building inspectors and supervisors be required to obtain the following three certifications: (i) 1 & 2 Family Dwelling Inspection (Examination 1A); (ii) Building General (Examination 1B); and (iii) Fire Protection General (Exam 3B). *Id.*

Commissioner Mosley agreed with BOCA's recommendations, and in late July 2000, with the approval of City Council and the Mayor, the Department changed the certification requirements for housing inspectors and supervisors from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection. A-14, Reqs. 19-20; A-50; A-270-71, ¶¶ 5-6; A-276-77, ¶¶ 5-6. The Department also changed the certification requirements for building inspectors and supervisors to require them to obtain all three of the certifications recommended by BOCA Headquarters. Building inspectors and supervisors had to pass three different examinations to obtain these certifications. A-13, Req. 9; A-19, Req. 61; A-91; A-270-71, ¶¶ 5-6; A-276-77, ¶¶ 5-6. Because of this change in certification requirements, the Department decided to give all housing inspectors and supervisors the longer of one year from the date they were notified of the

[1] All references herein to the City's Personnel Code, 1 *Wilm. C.* Ch. 40, are to the version in effect prior to 2004, which is applicable to the facts involved in this case.

change or one year from the date they achieved permanent employee status in their current positions to obtain Property Maintenance and Housing Inspection Certification. *See* A-12, Reqs. 7-8; A-22, Req. 80; A-50; A-110; A-270-71, ¶ 6; A-276-77, ¶ 6. The Department also extended the BOCA certification deadlines for building inspectors and supervisors to two years from the date they achieved permanent employee status in their current positions. *See* A–13, Reqs. 9-10; A-270-71, ¶ 6; A-276-77, ¶ 6. The Department decided to allow building inspectors and supervisors a longer period than housing inspectors and supervisors to obtain the required BOCA certification because building inspectors and supervisors were required to pass three examinations which were more difficult than the one examination housing inspectors and supervisors were required to pass. *See* A-13, Req. 11; A-270-71, ¶ 6; A-276-77, ¶ 6.

Plaintiff John A. Albanese, Jr. is a white male of Italian ancestry. *See* A-218-19, ¶ 8. Plaintiff commenced employment with the City of Wilmington on June 11, 1979. *See id.* Plaintiff first began working for the Department of Licenses and Inspections in September 1990, when he accepted a position as a Housing Code Enforcement Officer. *See id.*; A-227. On September 1, 1996, Plaintiff was upgraded to the position of Senior Housing Code Enforcement Officer. *See* A-228. Plaintiff was promoted to the position of Housing Code Enforcement Supervisor on March 22, 1999. *See* A-13, Req. 13; A-41; A-271, ¶ 8.

Plaintiff was informed when he first applied for the Housing Code Enforcement Supervisor position in March of 1999 that, as a condition of his continuing employment, he would be required to obtain BOCA 1 & 2 Family Dwelling Inspection certification within one year of achieving permanent employee status in that position. *See* A-13-14, Reqs. 12, 14, 15, 17; A-39; A-43; A-45; A-271-72, ¶ 8; A-277, ¶ 7. Plaintiff's initial deadline for obtaining that certification was July 31, 2000. *See* A-14, Reqs. 16-17; A-45; A-271-72, ¶ 8; A-277, ¶ 7. By memorandum dated July 26, 2000, Defendant Mosley advised Plaintiff that, based on the recommendations of BOCA Headquarters, Plaintiff's certification requirement was being changed from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection, and that, because of this change, Plaintiff was being given an extension of approximately one year, until July 26, 2001, to obtain the

required certification.  *See* A-14, Reqs. 19-20; A-50; A-271-72, ¶ 8; A-277, ¶ 7.

Plaintiff was given the same opportunities to obtain assistance in preparing for the BOCA examination as similarly situated minorities. Trevor Knight, a Black male employed as a Plans Engineer with the Department, conducted training sessions to assist Department employees in preparing for the BOCA examinations.  *See* A-267-68, ¶¶ 2-3; A-277-78, ¶ 8.  The Department never requested that Mr. Knight provide this training.  *See* A-267-68, ¶ 3; A-277-78, ¶ 8.  He did so voluntarily and without any compensation.  *See id*.  These training sessions were conducted at the Department's offices during non-working hours and were open to **all** Department employees.  *See id*.  Mr. Knight spoke with Mr. Albanese directly to offer him assistance in preparing for the BOCA examinations, and personally invited him to participate in this training.  *See* A-267-68, ¶ 3. However,  Plaintiff simply chose not to participate.  *See id*.

The City later contracted with the National Training Institute to provide code enforcement training to employees of the Department.  *See* A-30, Reqs. 138, 139, 142; A-166-67; A-278, ¶ 9.  That training included assistance with preparation for the BOCA certification examinations required for both housing and building code inspectors and supervisors, including the Property Maintenance and Housing Inspection examination.  *See* A-30, Reqs. 140-42; A-166-67; A-278, ¶ 9. This training was open to all Department employees, including the Plaintiff.  *See* A 30-31, Reqs. 143-50; A- 168-75; A-278, ¶ 9. Plaintiff, in fact, attended the  code enforcement training sessions provided by the National Training Institute on May 8, 9, 15, 16, 29, and 30, June 6, 12, 13, 19, and 20, and July 10, 11, 17 and 18, 2001.  *See* A-31-35, Reqs. 151-84; A-176-207; A-278, ¶ 9; A-284-85.

The BOCA Property Maintenance and Housing Inspection certification examination is offered four times each year.  *See* A-14, Req. 21; A-271, ¶ 7; A-278, ¶ 10.  Plaintiff took that examination only twice, on June 26, 2001 and July 25, 2001.  *See* A-14, Req. 23; A-278, ¶ 10.  On the June 26, 2001 examination, Plaintiff received a score of 56, which was a failing grade.  *See* A-15, Reqs. 27-28; A-48; A-278, ¶ 10.  Plaintiff received a score of 73 on the July 25, 2001 examination, which was also considered a failing grade.

*See* A-15, Reqs. 29-30; A-47; A-278, ¶ 10. Plaintiff admitted to Martha Gimbel, the City's Labor Relations and Classifications Manager, that he should have "studied sooner" for the examination. *See* A-242, ¶¶ 2-3.

Like all other housing inspectors and supervisors, Mr. Albanese had the opportunity to take the examination on four occasions during the one year period allowed for obtaining BOCA Property Maintenance and Housing Inspection certification. *See* A-14, Req. 21; A-271, ¶ 7; A-278, ¶ 10. However, he chose to take it only twice. *See* A-14, Req. 23; A-278, ¶ 10. He also waited until only approximately a month before his July 26, 2001 deadline to take the examination for the first time. *See id.* The Department terminated Plaintiff's employment as a Housing Code Enforcement Supervisor effective July 27, 2001 because of his failure to obtain the BOCA Property Maintenance and Housing Inspection certification by his July 26, 2001 deadline. *See* A-15, Reqs. 31-32; A-52; A-54; A-250, ¶ 3.

Plaintiff was not given less time than similarly situated African American and Hispanic employees to prepare for and take the required BOCA examination. All housing inspectors were given one year from the date they achieved permanent employee status or one year from the date they were informed of the change in certification requirements from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection, whichever was later, to obtain the required certification. *See* A-12, Reqs. 7-8; A-22, Req. 80; A-50; A-110; A-270-71, ¶ 6; A-276-77, ¶ 6.

Plaintiff's Complaint identifies three minorities who were supposedly given more time than Plaintiff to obtain the required BOCA certification: Kathy Holliday-Lane and Arthur Walker, who are African American, and Juan Diaz, who is Hispanic. *See* A-222-24 ¶¶ 20-22. Two of these employees, Arthur Walker and Juan Diaz, were not similarly situated to Plaintiff. Diaz was a building code inspector and Walker was a building code supervisor, unlike Plaintiff, who was a housing code supervisor. *See* A-13, Req. 13; A-19, Req. 58; A-230; A-272, ¶ 11; A-280, ¶ 14. Building code inspectors and supervisors were subject to different certification requirements than housing code inspectors and supervisors. *See* A-12-13, Reqs. 7-11; A-270-71, ¶¶ 5-6; A-272, ¶ 11; A-276-77, ¶¶ 5-6; A-280, ¶ 14. They were required to pass three different

-11-

examinations that were more difficult than the Property Maintenance and Housing Inspection examination housing code inspectors and supervisors were required to pass. *See* A-12-13, Reqs. 7, 9, 11; A-270-71, ¶¶ 5-6; A-276-77, ¶¶ 5-6; A-280, ¶ 14. Because of the greater number and difficulty of their examinations, building code inspectors and supervisors were given a two-year period to obtain the required BOCA certification, whereas housing code inspectors and supervisors were given only one year. *See* A-12-13, Reqs. 7-11; A-270-71, ¶¶ 5-6; A-276-77, ¶¶ 5-6; A-280, ¶ 14.

Kathy Holliday-Lane was not given more time than the Plaintiff to prepare for and pass the BOCA Property Maintenance and Housing Inspection examination. A-278-79, ¶ 11. The Department hired Ms. Holliday-Lane as a full time Housing Code Enforcement Inspector, effective May 15, 2000. *See* A-21, Reqs. 72, 75-76; A-103-04; A-272, ¶ 9. She had previously been employed as a temporary employee of the Department. *See* A-21-22, Reqs. 71, 75, 77; A-101; A-108. The Department adjusted Kathy Holliday-Lane's hiring date from May 15, 2000 to February 15, 2000 because the City Code allowed a hiring date adjustment to be made for individuals who were hired as full time employees immediately following temporary employment. *See id.*; 1 *Wilm. C.* § 40-221(a), A-240. Although Ms. Holliday-Lane's hiring date was changed to February 15, 2000, she was required to successfully complete a three month probationary period from May 15, 2000 to August 15, 2000 before she could achieve permanent employee status. *See* A-21-22, Reqs. 71, 75, 78; A-101; A-108; 1 *Wilm. C.* §§ 40-221(a) and 40-226, A-240-41. Ms. Holliday-Lane became a permanent employee in the position of Housing Code Enforcement Inspector on August 15, 2000. *See* A-22, Reqs. 79-80; A-110; A-272, ¶ 9; A-278-79, ¶ 11. Kathy Holliday-Lane's deadline for obtaining the BOCA Property Maintenance and Housing Inspection certification was August 15, 2001, which was her one year anniversary as a permanent employee in the position of Housing Code Enforcement Inspector. *See* A-22, Req. 82; A-108; A-110; A-272, ¶ 9; A-278-79, ¶ 11. Ms. Holliday-Lane took the Property Maintenance and Housing Inspection examination on February 13, 2001 and August 15, 2001. *See* A-22-23, Reqs. 83-87; A-112; A-114; A-116; A-278-79, ¶ 11. She did not succeed on her first attempt. *See* A-112; A-278-79, ¶ 11.

-12-

However, she passed the examination on August 15, 2001, within the one-year deadline for obtaining the required BOCA certification. *See* A-23, Reqs. 87-90; A-116; A-118; A-278-79, ¶ 11.

African American housing inspectors and supervisors who were not able to obtain the necessary BOCA certification within the one-year deadline had their employment terminated. A-279, ¶ 12. Dennis Porter, who is African American, was hired as a Housing Code Enforcement Inspector effective May 3, 1999. *See* A-26, Reqs. 109-11; A-138; A-140; A-272, ¶ 10; A-279, ¶ 12. Mr. Porter achieved permanent employee status in that position on August 3, 1999. *See* A-26-27, Req. 115; A-272, ¶ 10; A-278-79, ¶ 12. Mr. Porter's original deadline for obtaining BOCA certification was August 3, 2000, which was one year after the date he achieved permanent employee status as a housing inspector. *See id.* Like Mr. Albanese, Mr. Porter was subsequently given an extension of approximately one year to obtain BOCA certification after the Department decided to change the certification requirement for housing inspectors and supervisors from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection. *See* A-27, Reqs. 116-19; A-144; A-146; A-272, ¶ 10; A-278-79, ¶ 12. Mr. Porter was unable to obtain BOCA Property Maintenance and Housing Inspection certification by the new deadline, and consequently, the Department terminated his employment effective August 6, 2001. *See* A-27-28, Reqs. 120-23; A-148; A-150; A-151; A-278-79, ¶ 12.

James A. Brown, who was also African American, was hired as a full time Housing Code Enforcement Inspector effective August 30, 2002. *See* A-28, Reqs. 124-25, 127; A-153; A-155; A-279-80, ¶ 13. The Department adjusted Mr. Brown's hiring date from August 30, 2002 to May 30, 2002 because he had previously worked as a temporary employee of the Department, and the City Code allowed a hiring date adjustment to be made for individuals who were hired as full time employees immediately following temporary employment. *See* A-28, Reqs. 126, 128; A-158; 1 *Wilm. C.* § 40-221(a), A-240. Although Mr. Brown's hiring date was adjusted to May 30, 2002, he was still required to successfully complete a three-month probationary period from August 30, 2002 to November 30, 2002, before he could become a permanent employee. *See* A-28, Req. 129; A-158; 1 *Wilm. C.* §§ 40-221(a) and 226, A-240-41. Mr. Brown

-13-

achieved permanent employee status as a Housing Code Enforcement Inspector on November 30, 2002. *See* A-29, Req. 130; A-158; A-279-80, ¶ 13.  Mr. Brown's deadline for obtaining BOCA Property Maintenance and Housing Inspection certification was Monday, December 1, 2003, which was approximately one year from the date he achieved permanent employee status as a housing inspector. *See* A-28-29, Reqs. 125, 133; A-155; A-279-80, ¶ 13. The Department terminated Mr. Brown's employment effective December 3, 2003 because of his failure to obtain the required BOCA certification by his December 1, 2003 deadline. *See* A-29, Reqs. 134-36; A-162; A-164; A-279-80, ¶ 13.

Although building code inspectors and supervisors such as Arthur Walker and Juan Diaz were not similarly situated to the Plaintiff, they, like Mr. Albanese, were given extensions of their BOCA certification deadlines only for reasonable cause and were terminated if they failed to meet those deadlines.  On May 27, 1999, the Department hired Juan Diaz for the position of Senior Code Enforcement Officer, which had a pay grade of L. *See* A-24, Reqs. 93-95; A-122; A-124; A-242-43, ¶ 4.  Because Mr. Diaz had previously worked as a temporary employee of the Department, his hiring date was adjusted to February 27, 1999 for purposes of seniority and benefits, as required under the City Code.  *See* A-24, Reqs. 92-93; A-124; 1 *Wilm. C.* § 221(a) and 40-81(b), A-240; A-242-43, ¶ 4.  Mr. Diaz's position was reclassified and upgraded to that of Code Enforcement Inspector, salary grade M, on July 1, 1999.  *See* A-229; A-242-43, ¶ 4.

Contrary to Plaintiff's assertions, Mr. Diaz was transferred in September 1999 based on the needs of the Department and not any intent to allow him to circumvent the BOCA certification requirement. A-272, ¶ 12. In September 1999, the Department obtained approval for an additional Mechanical Code Enforcement Inspector position, which involved plumbing inspection. *See id*.; A-243, ¶ 5; A-280, ¶ 15. At that time, Mr. Diaz was the only Department employee with plumbing experience other than the Mechanical Code Enforcement Supervisor (who was the chief plumbing inspector). *See* A-243, ¶ 5; A-272, ¶ 12; A-280, ¶ 15. Because of the immediate need to fill the new Mechanical Code Enforcement Inspector position, Mr. Diaz was temporarily transferred to that position, with no adjustment in salary. *See id*; A-24, Reqs. 96-97; A-126.

Mr. Diaz was transferred back to his regular position of Code Enforcement Inspector on January 14, 2000. *See* A-24, Reqs. 98-99; A-128; A-243, ¶ 5; A-272, ¶ 12; A-280, ¶ 15.   On July 10, 2000, Mr. Diaz was promoted to the position of Building Code Enforcement Inspector, which had a pay grade of Q.  *See* A-230; A-243, ¶ 5; A-273, ¶ 13; A-280-81, ¶ 16.   Mr. Diaz achieved permanent employee status in the position of Building Code Enforcement Inspector on October 10, 2000.  *See* A-130; A-230; A-243, ¶ 5; A-273, ¶ 13; A-280-81, ¶ 16; 1 *Wilm. C.* §§ 40-221(a) and 40-226, A-240-41.

In the position of Building Code Enforcement Inspector, Mr. Diaz's initial deadline for obtaining BOCA certification as a building inspector was April 10, 2002, which was 18 months after the date he achieved permanent employee status in that particular position.  *See* A-25, Reqs. 100, 103; A-130; A-132; A-273, ¶ 13; A-280-81, ¶ 16.  Mr. Diaz was given only 18 months, while other building inspectors had their deadlines extended to two years, when the Department decided to change the BOCA certification requirements for building inspectors in July 2000 to require them to pass two other examinations in addition to the 1 & 2 Family Dwelling Inspection examination.  *See* A-273, ¶ 13; A-180-81, ¶ 16. Mr. Diaz was given less time because he had previously held a number of other positions as a building inspector which also required BOCA certification in 1&2 Family Dwelling Inspection.  *See id.*  The Department, therefore, believed it was necessary to adjust Mr. Diaz's deadline to account for the time he had to prepare for and take the BOCA 1&2 Family Dwelling Inspection examination while working in those other positions.  *See id.*

The BOCA certification deadlines for both Mr. Diaz and Mr. Albanese (as well as for all other Department employees) ran from the date they became permanent employees in their **current** positions, even though Mr. Albanese had held prior positions as a housing code inspector and supervisor, and Mr. Diaz had previously held other positions as a building code inspector.  *See* A-273-74, ¶ 14.  Mr. Albanese and Mr. Diaz were treated no differently in this respect.  *See id.*

On July 9, 2001, Mr. Diaz's certification deadline was extended from April 10, 2002 until July 10, 2002 because of BOCA's decision to suspend the availability of one of the required examinations from April

2, 2001 until July 2, 2001 so it could revise that test.  *See* A-25, Reqs. 103-04; A-132; A-281, ¶ 17.  On October 9, 2001, Mr. Diaz's certification deadline was again extended from July 10, 2002 until December 2, 2002 because of a delay in providing him with study materials for the General Fire Protection examination until August of 2001.  *See* A-25, Reqs. 105-06; A-134; A-281, ¶ 17.  On November 11, 2002, before his certification deadline expired, Mr. Diaz submitted his resignation as Building Code Enforcement Inspector, effective December 2, 2002.  *See* A-26, Reqs. 107-08; A-136; A-243, ¶ 5; A-281, ¶ 17.

Arthur Walker was promoted to the position of Building Code Enforcement Supervisor effective March 22, 1999.  *See* A-19, Reqs. 57-58; A-89; A-274, ¶ 15; A-281-82, ¶ 18.  Mr. Walker achieved permanent employee status in that position on June 22, 1999.  *See* A-19, Req. 59; 1 Wilm. C. §§ 40-221(a), 40-226, A-240-41; A-274, ¶ 15; A-281, ¶ 18.  Mr. Walker's original deadline for obtaining BOCA certification was June 22, 2000.  *See* A-19, Req. 60; A-274, ¶ 15; A-281, ¶ 18.  However, when the Department decided to change the certification requirements for building code inspectors and supervisors based on BOCA's recommendations, Mr. Walker's certification deadline was extended until June 22, 2001, which was two years after the date he had achieved permanent employee status as the Building Code Enforcement Supervisor.  *See* A-19-20, Reqs. 61-63; A-91; A-274, ¶ 15; A-281-82, ¶ 18.  On June 21, 2001, Mr. Walker's June 22, 2001 certification deadline was extended until October 2, 2001 because of BOCA's decision to suspend the availability of one of the required examinations from April 2, 2001 to July 2, 2001 so it could revise that test.  *See* A-20, Reqs. 64-65; A-93; A-281-82, ¶ 18. The Department also granted extensions to all other building code inspectors and supervisors who were affected by the temporary unavailability of that test.  *See* A-25, Reqs. 103-04; A-132; A-281-82, ¶ 18. On October 1, 2001, the Department again extended Mr. Walker's certification deadline from October 2, 2001 until February 21, 2002 because of a delay in providing him with study materials needed to prepare for the General Fire Protection examination until August of 2001.  *See* A-20, Reqs. 66-67; A-95; A-281-82, ¶ 18.  Mr. Diaz  and all other building code inspectors and supervisors who were affected by this delay were, likewise, granted extensions

-16-

of their certification deadlines. *See* A-25, Reqs. 105-06; A-134; A-281-82, ¶ 18. The Department terminated Mr. Walker's employment on February 21, 2002 because of his failure to obtain the required BOCA certification by that date. *See* A-20-21, Req. 68-70; A-97; A-99; A-281-82, ¶ 18.

Ironically, in May of 2002, Mr. Walker filed a charge of employment discrimination against the City, alleging that Mr. Albanese was given more favorable treatment with respect to the BOCA certification requirement because Mr. Albanese's examination consisted of one component rather three, was less difficult, was paid for by the City and was given at a different facility; and Mr. Albanese supposedly received better training for the examination. *See* A-231. The Delaware Office of Labor Law Enforcement ultimately determined there was no reasonable cause to believe the City had discriminated against Mr. Walker, and Mr. Walker did not pursue the matter any further. *See* A-232-33.

On August 15, 2001, the City posted a job announcement for the Housing Code Enforcement Supervisor position previously held by Plaintiff. *See* A-16, Req. 33; A-56; A-250-51, ¶ 4; A-282-83, ¶ 19. Plaintiff re-applied for this position on August 15, 2001. *See* A-16, Req. 34; A-56; A-58-61; A-282-83, ¶ 19. Plaintiff, James Rhodes, and Page Lane were the only persons who were initially certified as eligible to be interviewed for the position.[2] *See* A-16, Reqs. 35, 36, 38; A-63; A-65; A-250-51, ¶ 4; A-282, ¶ 19. On September 24, 2001, James Rhodes withdrew from the selection process because of the City's residency requirement and the fact that he had obtained employment elsewhere. *See* A-16-18, Reqs. 37-38, 43, 48; A-65; A-71; A-80; A-251, ¶ 5; A-282, ¶ 19. On October 12, 2001, the City's Personnel Administrator, William C. Jones, I, recommended Plaintiff to fill the position of Housing Code Enforcement Supervisor because, of the two candidates remaining after James Rhodes withdrew his application, Plaintiff had obtained the higher overall score in the selection process. *See* A-16-17, Reqs. 38-39; A-65; A-251, ¶¶ 5, 7; A-282-83, ¶ 19.

---

[2] When a candidate is certified as eligible for a position, it means he or she possesses the minimal, preliminary qualifications necessary to be considered and interviewed for the position. A-250-51, ¶ 4. It does not mean the candidate possesses all of the qualifications necessary to be **hired** for the position. *Id*. It usually cannot be determined until after a candidate has been interviewed whether he or she has all of the essential qualifications and is best suited to fill the position. *Id*.

By memorandum dated October 15, 2001, Defendant Starkey advised the City's Director of Personnel, Monica Gonzalez-Gillespie, that, due to the limited number of applications received for the Housing Code Enforcement Supervisor position, he wanted the position to be re-posted so it could be advertised to reach a wider market of potential qualified applicants. *See* A-17, Reqs. 40-41; A-67; A-251, ¶ 6; A-283, ¶ 20. Section 40-128 of the Wilmington City Code grants Commissioners discretion to order the re-posting of a position when there are fewer than three qualified candidates on the certification list. *See* 1 *Wilm. C.* § 40-128(2)(a), A-239; A-251, ¶ 6.

Section 40-128 has be utilized by the City in a race-neutral manner on numerous occasions in the past to obtain the re-posting of positions when there were fewer than three qualified candidates. *See* A-244-45, ¶¶ 3-5; A-252-56, ¶¶ 9-18. For example, after a Traffic Electrician position was posted on August 20, 1999, only one candidate was certified as eligible for the position. A-253, ¶ 10. The position was re-posted on November 12, 1999, and three candidates were certified. *Id*. An Hispanic male, Angel Rodriguez was hired for the position. *Id*. However, he did not successfully complete the probationary period and Frank Morgan, a White male with the second highest score was hired. *Id*.

When a Maintenance Mechanic I position was posted on January 13, 2000, only two persons applied, and neither was certified as eligible for the position. A-253, ¶ 11. The position was re-posted on February 11, 2000, and an Hispanic male, Richard Bruno, was ultimately hired. *Id*.

A Mechanical Code Enforcement Inspector position was posted on June 8, 2000, and none of the three applicants were certified as eligible for the position. A-253, ¶ 12. The position was then re-posted on August 14, 2000. *Id*. Three applicants were certified after the position was re-posted and Paul Rodriguez, an Hispanic male, was hired for the position. *Id*.

When a Recreation Program Coordinator position was posted on June 28, 2000, no applicants were certified as eligible for the position. A-253-54, ¶ 13. The position was re-posted on September 29, 2000, and three applicants were certified. Shawn Baker, a Black male, was then selected for the position. *Id*.

After the position of Network Supervisor was posted on July 13, 2000, fewer than three candidates were certified as eligible for the position. A-244, ¶ 3. The position was then re-posted on September 8, 2000, and Pan Thach, a male of Asian descent, was hired for the position. *Id*.

The position of Senior Analyst Contracts Manager was posted on September 9, 2005. A-254, ¶ 14; A-244-45, ¶ 4. The only applicant initially certified as eligible to fill that position was an African American male. *Id*. After that applicant was interviewed, the position was re-posted pursuant to City Code § 40-128(2)(a )on November 11, 2005, because there were fewer than three qualified candidates. *Id*. After the re-posting, two Caucasian males were certified as eligible for the position, but one of them subsequently withdrew from the selection process. *Id*. Because there are still fewer than three qualified candidates, no one has yet been hired, and the position will soon be re-posted for the second time. *Id*.

The position of Labor Foreman I with the Department of Parks and Recreation was initially posted on January 20, 2005. A-254-55, ¶ 15. Two African-American males were originally certified as eligible to fill the position. *Id*. After the two African American candidates were interviewed, it was determined they were not qualified for the position. *Id*. Consequently, on April 8, 2005, the position was re-posted pursuant to City Code § 40-128(2)(a). *Id*. After the re-posting, an Hispanic male was certified as eligible for the position. *Id*. He was interviewed, but was not offered the position because it was determined that he lacked all of the qualifications we were seeking. *Id*. Because there were still fewer than three qualified candidates, the position was again re-posted on May 25, 2005. *Id*. A Black male and a Black female were certified as eligible for the position after the May 25, 2005 re-posting and were given interviews. *Id*. However, the position was re-posted again on June 30, 2005 because there still were not a sufficient number of qualified candidates. *Id*. Following the June 30, 2005 re-posting, four African American males were certified as eligible for the position and given interviews. *Id*. These candidates were also found to lack sufficient qualifications, and the position was re-posted once again on October 5, 2005. *Id*. One African American male was certified as eligible for the position after the October 5, 2005 re-posting. *Id*. But, upon interviewing

-19-

him, it was determined  he lacked all of the sought-after qualifications, and the position was re-posted yet again on November 22, 2005. *Id*. A White male was certified as eligible for the position after the November 22, 2005 re-posting. *Id*. The position was ultimately awarded to this White male candidate. *Id*.

A Building Code Enforcement Inspector position with the Department of Licenses and Inspections was originally posted on August 30, 2005. A-255*, ¶ 16*. Two Black males and one White male were initially certified as eligible and interviewed for the position. *Id*. The position was re-posted pursuant to City Code § 40-128(2)(a) on October 5, 2005, because the three initial applicants were found to lack sufficient qualifications.  *Id*. After the re-posting, two applicants were certified as eligible for the position and granted interviews.  *Id*. One was a White male and the other was a  male whose race was unknown.  *Id*. Those two candidates were also determined to lack all of the essential qualifications, and the position was again re-posted on November 11, 2005.  *Id*. After the second re-posting, a White male and a Black male were certified as eligible for the position.  *Id*. However, the position was once again re-posted on December 29, 2005 because, after being interviewed, those candidates were likewise found to lack all of the sought-after qualifications.  *Id*. Following the December 29, 2005 re-posting, two Black males and one White male were certified as eligible and interviewed for the position.  *Id*. But they, too, were determined to lack all of the qualifications the Department was seeking. Consequently, the position will be re-posted yet another time in the near future. *Id*.

A Mechanical Code Enforcement Inspector position was originally posted on June 28, 2005. A-255-56, ¶ 17. Two Black males and one White male were initially certified as eligible for the position and granted interviews.  *Id*.  The position was re-posted pursuant to City Code § 40-128(2)(a) on August 15, 2005, because the three initial candidates were ultimately determined to lack sufficient qualifications.  *Id*. After the re-posting, three White males and one Black male were certified as eligible for the position.  *Id*. However, after being interviewed, they were found to lack all of the desired qualifications, and the position was re-posted a second time on September 6, 2005.  *Id*. Following the second re-posting, a Black male and

a White male were certified as eligible for the position and given interviews. *Id*. But, they were likewise determined to lack all of the sought-after qualifications, and, consequently, the position was re-posted a third time on November 3, 2005. *Id*. The City did not receive any applications in response to the November 3, 2005 re-posting, and the position was again re-posted on November 22, 2005. *Id*. No applicants were certified as eligible for the position after the November 22, 2005 re-posting, and position was once again re-posted on December 15, 2005. *Id*. Two White males were certified as eligible for the position following the December 15, 2005 re-posting. *Id*. However, neither of them possessed all of the desired qualifications, and the position will be re-posted again shortly. *Id*.

Mr. Jones initially recommended Plaintiff for the Housing Code Enforcement Supervisor position because it was his routine practice to recommend the candidate with the highest overall score in the selection process for a position, even when there were fewer than three certified candidates. *See* A-251, ¶ 7. Mr. Jones did not have the authority to order the re-posting of a position when there were fewer than three certified candidates. *See id*.; 1 *Wilm. C*. § 40-128(2)(a), A-239. Only Commissioners have the power to do so under § 40-128(2)(a) of the City Code. *See id*.

Pursuant to Commissioner Starkey's request, and as permitted under 1 *Wilm. C*. § 40-128, the Housing Code Enforcement Supervisor position was re-posted on November 8, 2001. *See* A-17, Req. 42; A-69; A-252, ¶ 8; A-283, ¶ 20. After the position was reposted, four additional persons – Juan Diaz, Robert Sniadowski, Kevin Wilson and Wesley Johnson – were certified as eligible to fill the position. *See* A-17, Reqs. 43-44; A-71; A-252, ¶ 8; A-283, ¶ 20. The Housing Code Enforcement Supervisor position was ultimately awarded to Kevin Wilson. *See* A-18-19, Reqs. 52-54; A-82; A-84-85; A-252, ¶ 8; A-283, ¶ 20. William C. Jones I concurred with the Department's selection of Mr. Wilson for the Housing Code Enforcement Supervisor position after the position was re-posted because Mr. Wilson had received the highest overall score in the selection process and was the candidate most qualified for the position. *See* A-18, Req. 52; A-82; A-257-60; A-252, ¶ 8. Mr. Wilson received a total score of 77.5 in the selection process,

while Plaintiff received a total score of only 75. *See* A-80; A-82; A-84-85; A-252, ¶ 8; A-257-60. Mr. Wilson was already BOCA certified in Property Maintenance and Housing Inspection when he applied for the Housing Code Enforcement Supervisor position. *See* A-17-18, Reqs. 45-47; A-73-78; A-252, ¶ 8; A-283, ¶ 20; A-287, ¶ 4; A-288-98. Plaintiff, in contrast, still had not obtained the required BOCA certification when he re-applied for his former position. *See* A-14, Req. 23; A-16, Req. 34; A-58-61; A-252, ¶ 8; A-283, ¶ 20.

## ARGUMENT

### I.    STANDARD OF REVIEW

The Court must grant summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), *cert denied*, 484 U.S. 1066 (1988), and *Arnold Pontiac-GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 568 (3d Cir. 1986). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *See Matsushita Electric Industries Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10, (1986). The moving party is not required to negate the non-movant's claim, but instead, is only required to point out the lack of evidence supporting the claim. *Carrigan v. State*, 957 F. Supp. 1376, 1381 (D. Del. 1997); *see also Big Apple BMW, Inc., et.al v. BMW of North America, Inc.*, et. al, 974 F.2d 1358, 1362 (3d Cir. 1992).

Once the moving party puts forth a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the non-moving party cannot produce "concrete evidence from which a reasonable juror could return a verdict in his favor," then summary judgment for the movants must be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of some evidence in support of the nonmoving party . . . will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving

party on that issue." *Lamb-Bowman v. Delaware State Univ.*, 152 F.Supp.2d 553, 558 (D. Del. 2001) (citing *Anderson*, 477 U.S. at 249).

A factual issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Wayne v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). To demonstrate a genuine issue of material fact, the non-movant must provide "significant probative evidence tending to support the complaint." *See Anderson*, 477 U.S. at 249. The moving party "may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987).

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF REVERSE RACIAL DISCRIMINATION UNDER TITLE VII

### A. Standard Applicable in Reverse Discrimination Cases

In the Third Circuit, cases alleging reverse discrimination are governed by the standard set forth in *Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999). *Medcalf v. Trustees of Univ. of Pennsylvania*, 71 Fed. Appx. 924, 927, 2003 U.S. App. LEXIS 16110, at *6 (3d Cir. July 30, 2003). In *Iadimarco*, the court developed a modified *McDonnell Douglas* burden shifting analysis to be applied in reverse discrimination cases. *See Iadimarco*, 190 F.3d at 157-163, 165-66. Pursuant to this standard, the plaintiff must first establish a prima facie case of reverse discrimination. To do so, in the absence of direct evidence of discrimination, the plaintiff must present sufficient evidence to allow a reasonable fact finder to conclude, based on the totality of the circumstances, that the defendant treated the plaintiff less favorably than others because of his race. *Id.* at 160-61, 164; *Medcalf*, 2003 U.S. App. LEXIS 16110 at *6. If the plaintiff can make this prima facie showing, the burden of production shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Medcalf*, 2003 U.S. App. LEXIS 16110 at *7; *see Iadimarco*, 190 F.3d at 165-66. This burden is one of production rather than persuasion and can involve no credibility assessment. *Medcalf,* 2003 U.S. App. LEXIS 16110 at *7. If the defendant meets this

burden of production, the presumption of discrimination is rebutted, and the burden again shifts to the plaintiff to prove by a preponderance of the evidence that the defendant's articulated reasons are merely pretextual. *Id.* at *7-8; *Iadimarco*, 190 F.3d at 165-66. To demonstrate the proffered reasons are pretextual, "'the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Iadimarco*, 190 F.3d at 165-66 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)); *Medcalf*, 2003 U.S. App. LEXIS 16110 at *8. "'[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a posthoc fabrication or otherwise did not actually motivate the employment action.'" *Iadimarco*, 190 F.3d at 166 (quoting *Fuentes*, 32 F.3d at 764); *Medcalf*, 2003 U.S. App. LEXIS 16110 at *8. The plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Iadimarco*, 190 F.3d at 166 (quoting *Fuentes*, 32 F.3d at 765); *Medcalf*, 2003 U.S. App. LEXIS 16110 at *8-9.

### B.     Plaintiff Cannot Demonstrate that Similarly Situated Minorities Were Treated More Favorably

One of the necessary elements of prima facie case of reverse racial discrimination is that the plaintiff was treated less favorably than similarly situated minorities. *See Iadimarco,* 190 F.3d at 161 (holding that, to establish a prima facie case in the context of reverse racial discrimination, the plaintiff must demonstrate that the employer is treating some people less favorably than others because of their race); *Boggs v. Commonwealth of Kentucky*, 1996 U.S. App. LEXIS 30332, at *9 (6th Cir. Nov. 20, 1996) (holding that, to prove reverse discrimination, a plaintiff must demonstrate he was treated differently than a similarly-situated

-24-

member of a racial minority); *cf.*, *Taylor v. Potter*, 2004 U.S. Dist. LEXIS 16629, at *8, 11 (D. Del. Aug. 18, 2004) (concluding that the plaintiff had failed to establish a prima facie case of racial discrimination where she had failed to demonstrate that any similarly situated employees outside of her racial class were treated more favorably). This court has held that any inference of unlawful discrimination is extinguished when similarly situated minorities and caucasian employees are treated equally. *McIntyre v. Wilmington*, C.A. No. 01-396-GMS, at p. 9, Sleet, J. (D. Del. July 9, 2002).

In the present case, Mr. Albanese cannot establish a prima facie case of reverse discrimination because he cannot demonstrate that he was treated less favorably than any similarly situated minorities. Any inference of unlawful discrimination is extinguished by the fact that similarly situated minorities were offered the same training as Plaintiff; had the same number of opportunities to take the Property Maintenance and Housing Inspection examination; were given the same amount of time as Plaintiff to prepare for and pass that examination; like Plaintiff, had their employment terminated if they failed to obtain the required BOCA certification by the applicable deadline; and had positions for which they applied re-posted after they were certified as eligible for those positions.

Similarly situated minorities were offered the same training as Mr. Albanese to assist them in preparing for the BOCA examination. Trevor Knight, a Black male who is employed as a Plans Engineer with the Department, conducted training sessions to assist Department employees in preparing for the BOCA examinations. *See* A-267-68, ¶¶ 2-3; A-277, ¶ 8. Mr. Knight provided this training voluntarily, without any request or compensation by the City. *See* A-267-68, ¶ 3; A-277-78, ¶ 8. These training sessions took place in the Department's offices during non-working hours. *See id.* They were open to all Department employees, including the Plaintiff. *See id.* Mr. Knight approached Plaintiff directly to offer him assistance in preparing for the BOCA examination, and personally invited Plaintiff to attend these training sessions. *See* A-267-68, ¶ 3. Plaintiff, unlike Dennis Porter and Kathy Holliday-Lane, chose not to take advantage of the training provided by Mr. Knight. *See id.*

-25-

The Complaint's allegation that Plaintiff was provided with no training or assistance in preparing for the BOCA examination is blatantly false. The City contracted with the National Training Institute to provide code enforcement training to employees of the Department. *See* A-30, Reqs. 138-39, 142; A-166-67; A-278, ¶ 9. This training, which was available to all Department employees, included assistance in preparing for the BOCA Property Maintenance and Housing Inspection examination. *See* A-30-31, Reqs. 140-50; A-166-67; A-168-75; A-278, ¶ 9. Contrary to the Complaint's unsupported assertions, Plaintiff actually attended many of the training sessions conducted by the National Training Institute between early May and late July of 2001. *See* A-31-35, Reqs. 151-84; A-176-207; A-278, ¶ 9; A-284-85.

Plaintiff also had the same number of opportunities as similarly situated minorities to take the BOCA Property Maintenance and Housing Inspection examination. All housing code inspectors and supervisors were given the longer of one year from the date they were notified of the change in certification requirements from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection or one year from the date they became permanent employees in their current positions to obtain the required BOCA certification. *See* A-12, Reqs. 7-8; A-50; A-110; A-270-71, ¶ 6; A-276-77, ¶ 6. The BOCA Property Maintenance and Housing Inspection examination is offered four times per year. *See* A-14, Req. 21; A-271, ¶ 7; A-278, ¶ 10. Like all other housing code inspectors and supervisors, Plaintiff could have taken that examination up to four times during the one year period allowed for obtaining BOCA Property Maintenance and Housing Inspection certification. A-278, ¶ 10; A-271, ¶ 7. However, Plaintiff chose to take the examination only twice and waited until shortly before his July 26, 2001 certification deadline expired to do so. *See* A-14, Reqs. 19, 20, 23; A-50; A-278, ¶ 10.

Similarly situated minorities were given the same amount of time as the Plaintiff to prepare for and pass the BOCA Property Maintenance and Housing Inspection examination. When the Department changed the certification requirements for housing code inspectors and supervisors from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection in July of 2000, all housing inspectors and

-26-

supervisors were given the longer of one year from the date they were notified of the change or one year from the date they became permanent employees in their current positions to obtain BOCA Property Maintenance and Housing Inspection certification. *See* A-12, Reqs. 7-8; A-14, Reqs. 19-20; A-50; A-110; A-270-71, ¶ 6; A-276-77, ¶ 6. Thus, all housing inspectors and supervisors were given a period of approximately **one year** to prepare for and pass the Property Maintenance and Housing Inspection examination. *See id.* The Department terminated Plaintiff's employment because of his failure to obtain Property Maintenance and Housing Inspection certification by July 26, 2001, which was exactly one year after Plaintiff was notified of the change in BOCA certification requirements for housing inspectors and supervisors. *See* A-14-16, Reqs. 19-20, 31-32; A-47-48; A-51; A-52; A-54; A-250, ¶ 3; A-271-72, ¶ 8; A-277-79, ¶¶ 7, 10, 12.

Kathy Holliday-Lane, unlike Plaintiff, succeeded in obtaining the required BOCA certification during this one year period. She passed the Property Maintenance and Housing Inspection examination on August 15, 2001, which was exactly **one year** after the date she became a permanent employee in her current position. *See* A-22-23, Reqs. 79, 82, 87-90; A-108; A-110; A-116; A-118; A-272, ¶ 9; A-278-79, ¶ 11. There is absolutely no support in the record for Plaintiff's assertion that she was given preferential treatment.

African American housing inspectors and supervisors who failed to obtain Property Maintenance and Housing Inspection certification within this one year period, like Plaintiff, had their employment terminated. Dennis Porter, a Housing Code Enforcement Inspector, had his employment terminated in early August 2001 because of his failure to obtain Property Maintenance and Housing Inspection certification within one year after he was notified of the change in certification requirements for housing inspectors and supervisors. *See* A-27-28, Reqs. 116-23; A-144; A-146; A-148; A-150; A-151; A-278-79, ¶ 12. Similarly, James Brown, who was also employed as a Housing Code Enforcement Inspector, had his employment terminated in early December 2003 because of his failure to obtain Property Maintenance and Housing Inspection certification by December 1, 2003, which was his one year anniversary as a permanent employee in that position. *See* A-28-29, Reqs. 125, 130, 133-36; A-155; A-158; A-162; A-164; A-279-80, ¶ 13.

"To show that employees are similarly situated, the plaintiff has the burden to show that they were 'subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Messina v. E.I. DuPont de Nemours & Co.*, 308 F.Supp.2d 491, 497 (D. Del. 2004) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). Mr. Diaz and Mr. Walker were not similarly situated to the Plaintiff because Diaz was a building code inspector and Walker was a building code supervisor. A-12-13, Reqs. 7-11; A-19, Req. 58;A-89; A-230; A-271-72, ¶¶ 6, 11; A-276-77, ¶ 6; A-280, ¶ 14. They were, therefore, subject to different BOCA certification requirements and deadlines than the Plaintiff, who was a housing code supervisor. *Id.*; A-13, Req. 13; A-41. They also received certain extensions of their certification deadlines for reasons that did not apply to the Plaintiff. *See* A-20, Reqs. 64-67; A-25, Reqs. 103-06; A-93; A-95; A-132; A-134; A-281-82, ¶¶ 17-18. Although building and housing inspectors and supervisors were both initially required to obtain BOCA certification in 1&2 Family Dwelling Inspection, the Department changed the certification requirements for both types of employees in July of 2000. *See* A-12-14, Reqs. 6, 9, 19, 20; A-50; A-91; A-270-71, ¶¶ 4-6; A-276-77, ¶¶ 4-6. The certification required for housing inspectors and supervisors was changed to Property Maintenance and Housing Inspection. *See* A-14, Reqs. 19-20; A-50; A-270-71, ¶ 6; A-276-77, ¶ 6. The certification for building inspectors and supervisors, however, was changed to require them to pass three different exams: (1) 1&2 Family Dwelling, (2) Building General, and (3) Fire Protection General. *See* A-13, Req. 9; A-91; A-270-71, ¶¶ 5-6; A-276-77, ¶¶ 5-6. Because of the greater number and difficulty of their examinations, building inspectors and supervisors were given more time than housing inspectors and supervisors to obtain the required BOCA certifications. A-13, Req. 11; A-270-71, ¶ 6; A-276-77, ¶ 6. Housing inspectors and supervisors were given the longer of one year from the date they were notified of the change in certification requirements or one year from the date they became permanent employees in their current positions to obtain the required certification. *See* A-12, Reqs. 7-8; A-50; A-110; A-270-71, ¶ 6; A-276-77, ¶ 6. The certification deadline for building inspectors and supervisors,

-28-

on the other hand, was extended until two years from the date they achieved permanent employee status in their current positions. *See* A-13, Reqs. 9-10; A-270-71, ¶ 6; A-276-77, ¶ 6.

Mr. Diaz and Mr. Walker, like the Plaintiff, were given extensions of their BOCA certification deadlines for reasonable cause. When the Department decided to change the BOCA certification requirements for housing code inspectors and supervisors, Plaintiff was given an additional year, until July 26, 2001, to become BOCA certified. *See* A-14, Reqs. 19-20; A-50; A-271-72, ¶ 8; A-277, ¶ 7. Mr. Walker was, likewise, given an additional year to obtain BOCA certification when the Department changed the certification requirements for building inspectors and supervisors to include three different exams. *See* A-19-20, Reqs. 61-63; A-91; A-274 ¶ 15; A-281-82, ¶ 18.

Plaintiff's allegations that Defendants knowingly manipulated the assignments given to Mr. Diaz and continuously changed his deadline to allow him to circumvent the BOCA certification requirement altogether, are completely false and unsupported by any evidence in the record. The Department hired Mr. Diaz for the position of Senior Code Enforcement Officer on May 27, 1999. *See* A-24, Reqs. 93-95; A-122; A-124; A-242-43, ¶ 4. Mr. Diaz's position was reclassified to that of Code Enforcement Inspector and upgraded to a higher salary on July 1, 1999. *See* A-229; A-242-43, ¶ 4. In September 1999, the Department obtained approval for an additional Mechanical Code Enforcement Inspector position, which involved plumbing inspection. *See* A-243, ¶ 5; A-272, ¶ 12; A-280, ¶ 15. At that time, Mr. Diaz was the only Department employee other than the chief plumbing inspector who had plumbing experience. *See id.* Because of the immediate need to fill the new Mechanical Code Enforcement Inspector position, Mr. Diaz was temporarily transferred to that position. *See id.*; A-24, Reqs. 96-97; A-126. Mr. Diaz was transferred back to his regular position of Code Enforcement Inspector, which involved building inspection, on January 14, 2000. *See* A-24, Reqs. 98-99; A-128; A-243, ¶ 5; A-272, ¶ 12; A-280, ¶ 15. On July 10, 2000, Mr. Diaz was promoted to the higher-paying position of Building Code Enforcement Inspector. *See* A-230; A-243, ¶ 5; A-273, ¶ 5; A-280-81, ¶ 16. Mr. Diaz achieved permanent employee status in the position of Building

Code Enforcement Inspector on October 10, 2000. *See* A-130; A-230; A-243, ¶ 5; A-273, ¶ 13; A-280-81, ¶ 16; 1 *Wilm. C.* §§ 40-221(a) and 40-226, A-240-41.

In the position of Building Code Enforcement Inspector, Mr. Diaz's initial deadline for obtaining BOCA certification was April 10, 2002, which was 18 months after he became a permanent employee in that particular position. *See* A-25, Reqs. 100, 103; A-130; A-132; A-273, ¶ 13; A-280-81, ¶ 16. Mr. Diaz was given only 18 months, while other building inspectors had their deadlines extended to two years, after the Department changed the BOCA certification requirements in July 2000 to require building inspectors to pass two other examinations in addition to the 1 & 2 Family Dwelling Inspection exam. *See* A-273, ¶ 13; A-280-81, ¶ 16. Mr. Diaz was given a shorter amount of time than other building code inspectors and supervisors because he had previously held a number of other positions as a building inspector which also required BOCA certification in 1&2 Family Dwelling Inspection. *See id.* The Department gave Mr. Diaz a shorter certification deadline in light of the time he had to prepare for and take the BOCA 1&2 Family Dwelling Inspection examination while working in those other positions. *See id.*

The BOCA certification deadlines for both Mr. Diaz and Mr. Albanese ran from the date they became permanent employees in their **current** positions, even though Mr. Albanese had held prior positions as a housing code inspector and supervisor, and Mr. Diaz had previously held other positions as a building code inspector. A-273-74, ¶ 14. Mr. Diaz was treated no differently than the Plaintiff in this respect. *Id.*

Mr. Diaz and Mr. Walker were subsequently given additional extensions necessitated by the temporary unavailability of one of their required examinations and of certain essential study materials. *See* A-20, Reqs. 64-67; A-25, Reqs. 103-06; A-93; A-95; A-132; A-134; A-281-82, ¶¶ 17-18. Plaintiff was not given these same extensions because he was not affected by the suspension of the availability of that examination or by the delay in obtaining those study materials since he was subject to completely different certification requirements than Diaz and Walker. *See* A-281-82, ¶ 18. In June of 2001, Mr. Walker and Mr. Diaz both had their certification deadlines extended by approximately three months because of BOCA's

-30-

decision to suspend the availability of one of their required examinations from April 2, 2001 until July 2, 2001 so it could revise that test. *See* A-20, Reqs. 64-65; A-25, Reqs. 103-04; A-93; A-132; A-281-82, ¶¶ 17-18. In October 2001, the Department again extended Mr. Diaz and Mr. Walker's certification deadlines by several months because of a delay in providing them with study materials needed to prepare for the General Fire Protection examination until August 2001. *See* A-20, Reqs. 66-67; A-25, Reqs. 105-06; A-95; A-134; A-281-82, ¶¶ 17-18.

It is not true that Mr. Walker and Mr. Diaz were permitted to maintain their positions with the Department despite their failure to obtain the required BOCA certifications. On November 11, 2002, shortly before his certification deadline expired, Mr. Diaz submitted his resignation as Building Code Enforcement Inspector, effective December 2, 2002. *See* A-25-26, Reqs. 105-08; A-134; A-136; A-243, ¶ 5; A-281, ¶ 17. The Department terminated Mr. Walker's employment as Building Code Enforcement Supervisor in late February 2002 because of his failure to meet the BOCA certification requirements by his February 21, 2002 deadline. *See* A-20-21, Reqs. 68-70; A-97; A-99; A-281-82, ¶ 18.

In addition, similarly situated minorities, like Plaintiff, have also been negatively affected by the re-posting of positions pursuant to City Code § 40-128(2)(a) . On several occasions, other positions have been re-posted pursuant to City Code § 40-128(2)(a) after similarly Black and Hispanic applicants were certified as eligible for those positions. *See* A-244-45, ¶ 4; A-254-56, ¶¶ 14-17.

Plaintiff, thus, cannot establish a prima facie case of reverse discrimination because he cannot demonstrate that any similarly situated minorities were given more favorable treatment. Therefore, Defendants are entitled to summary judgment on all of the Plaintiff's claims.

### C.    Plaintiff Cannot Demonstrate that He Was Qualified for the Position of Housing Code Enforcement Supervisor

The Third Circuit has noted that the elements of a prima facie case of employment discrimination under Title VII remain flexible and must be tailored to fit the specific context of each case. *See Sarullo v.*

*United States Postal Service*, 352 F.3d 789, 797-98 (3d Cir. 2003). However, one essential element that undeniably must be established by the plaintiff in all cases is that he was **qualified** for the position in question. *See id.* at 797; *Taylor*, 2004 U.S. Dist. LEXIS 16629, at *8; *McIntyre*, C.A. No. 01-396-GMS, at p.8 Sleet, J. (D. Del. July 9, 2002).

Courts have held that the plaintiff failed to demonstrate he or she was qualified for a position where the plaintiff had failed to pass an examination or obtain a particular certification that was a job requirement for that position. In *Tehee v. Bd. of Educ.*, 1997 U.S. App. LEXIS 13898, at *2, 4-5 (9th Cir. Jun. 10, 1997), the plaintiff, a white male, brought a reverse racial discrimination action, alleging the state board of education had discriminated against him by not hiring him for a teaching position. The teaching position for which the plaintiff had applied involved the subjects of Industrial Arts and Agriculture. *See id.* at *4. The job posting for the position indicated that certification in both of those subjects was a necessary qualification for the position. *Id*. at *8. The school's principal testified that the school would accept an applicant who possessed either the required teaching certifications or equivalent work experience. *Id*. The plaintiff was the sole tenured applicant for the position, but was certified in only Industrial Arts, not Agriculture, and had no experience teaching either subject. *Id*. at *4, 8. After the plaintiff was interviewed, a committee of the board of education found he was unqualified for the position because he was not certified in Agriculture and possessed no equivalent work experience in that subject. *Id*. at *4. Subsequently, a non-tenured Asian-American teacher who was certified in Industrial Arts and Agriculture and had experience teaching both subjects was hired for the position. *See id.* at *5, 10-11. The 9th Circuit affirmed the district court's order granting summary judgment in favor of the defendants, finding that the plaintiff had failed to satisfy an essential element of a prima facie case of discrimination – that he was qualified for the position. *Id*. at *2, 6, 8-9.

Similarly, in *Rennie v. Dalton*, 3 F.3d 1100, 1103-05 (7th Cir. 1993), the Navy terminated the plaintiff's employment because she had failed to pass a soldering examination, which was required for her

position, after two unsuccessful attempts. The plaintiff then filed a sexual discrimination charge against the Navy with the EEOC. *Id*. at 1105. She subsequently reapplied for the same position, and the Navy refused to re-hire her. *Id*. at 1105, 1109. The plaintiff alleged the failure to rehire her was in retaliation for her filing of the discrimination charge with the EEOC. *Id*. at 1102-03, 1109. The district court held that the Navy had neither discriminated against the plaintiff on the basis of her sex nor retaliated against her for filing a discrimination charge with the EEOC. *Id*. at 1102-03. The Seventh Circuit affirmed, holding that the plaintiff's failure of the soldering examinations was a legitimate, non-discriminatory and non-retaliatory reason for her discharge. *See id*. at 1102-03, 1109. The court also found that the Navy's refusal to re-hire the plaintiff was not discriminatory or retaliatory, but instead, was prompted by her lack of qualifications for the position, since she had already failed the required soldering examination twice. *See id*. at 1102-03, 1109-10.

Plaintiff cannot establish a prima facie case of racial discrimination under Title VII because he cannot demonstrate he was qualified for the position of Housing Code Enforcement Supervisor. Plaintiff's employment was terminated in July 2001 because of his failure to meet one of the necessary qualifications for the Housing Code Enforcement Supervisor position – BOCA certification in Property Maintenance and Housing Inspection. *See* A-15, Reqs. 31-32; A-52; A-54; A-250, ¶ 3; A-276-79, ¶¶ 6-7, 10, 12. When Plaintiff re-applied for the same position in August 2001, he had **already** failed to meet one of the essential qualifications for the position – the requirement of obtaining BOCA certification in Property Maintenance and Housing Inspection within the longer of one year after becoming a permanent employee in that position, or one year after being notified of the change in BOCA certification requirements from 1 & 2 Family Dwelling Inspection to Property Maintenance and Housing Inspection. *See* A-52; A-58-61; A-250, ¶ 3; A-252, ¶ 8; A-276-79, ¶¶ 6-7, 10, 12; A-283, ¶ 20. Nothing had changed between the time Plaintiff had been terminated for failure to meet the BOCA certification requirement and the time he reapplied for the same position. He had not cured the deficiency by obtaining the required BOCA certification during the interim.

*See* A-14, Req. 23; A-47-48; A-58-61; A-252, ¶ 8; A-283, ¶ 20. Thus, as in *Tehee* and *Rennie*, Defendants' termination of and refusal to rehire Plaintiff were not racially motivated, but rather, resulted from his failure to meet all of the necessary qualifications for the position. Because Plaintiff cannot satisfy this essential element of a prima facie case under Title VII, the Court should grant summary judgment in Defendants' favor.

**D.     Plaintiff Cannot Establish Any Causal Connection Between His Race and the Actions Taken by Defendants**

The central focus of a prima facie case of racial discrimination under Title VII is always whether the employer is treating some people less favorably than others **because of** their race. *Sarullo*, 352 F.3d at 798. Thus, to establish a prima facie case of Title VII race discrimination, a plaintiff must demonstrate a causal nexus between his race and the employment actions taken by the defendants. *See id.* (finding that, to establish a prima facie case of discrimination, the plaintiff was required to demonstrate some causal nexus between his membership in a protected class and the defendants' decision not to rehire him).

Plaintiff cannot establish a prima facie case of discrimination under Title VII because he cannot show any causal connection between his race and the employment decisions made by Defendants. The fact that similarly situated minorities, such as Dennis Porter and James Brown, like Plaintiff, were also terminated for failure to obtain BOCA Property Maintenance and Housing Inspection certification by the applicable deadline, including reasonable extensions for good cause, shows that Plaintiff's termination was not racially motivated. *See* A-27-28, Reqs. 120-123; A-29, Reqs. 134-36; A-148; A-150; A-151; A-162; A-164; A-278-80, ¶¶ 12-13. The Department's selection of Kevin Wilson, who was **already** BOCA certified in Property Maintenance and Housing Inspection, for the Housing Code Enforcement Supervisor position demonstrates that Defendants refusal to re-hire Plaintiff for that position was not because of his race. *See* A-17-18, Reqs. 45-47; A-73-78; A-252, ¶ 8; A-283, ¶ 20; A-287, ¶ 4; A-288-98.

Moreover, all of the employment actions taken with respect to the Plaintiff were directly and

-34-

proximately caused by Plaintiff's own acts and omissions. Defendants' decision to terminate Plaintiff's employment as Housing Code Enforcement Supervisor and not to re-hire him for the same position both resulted from Plaintiff's demonstrated inability to obtain BOCA certification in Property Maintenance and Housing Inspection. *See* A-47-48; A-52; A-54; A-250, ¶ 3; A-252, ¶ 8; A-276, ¶¶ 6-7, 10, 12; A-283, ¶ 20. Plaintiff has only himself to blame for his failure to obtain the required BOCA certification. Plaintiff chose to take the Property Maintenance and Housing Inspection examination only twice, when he could have taken it four times. Further, Plaintiff waited until shortly before the July 26, 2001 deadline to even take the test the first time. *See* A-14, Reqs. 21, 23; A-278, ¶ 10. Plaintiff also failed to devote sufficient time and effort to studying for the examination. Plaintiff admitted to Martha Gimbel, the City's Labor Relations and Classifications Manager, that he should have started studying sooner for the examination, thus acknowledging that he himself was responsible for his failure to meet the BOCA certification requirement. *See* A-242, ¶ 3. It was also Plaintiff's own decision not to take advantage of the training sessions provided by Trevor Knight. *See* A-267-68, ¶ 3; A-277-78, ¶ 8. Mr. Knight personally offered Plaintiff assistance in preparing for the BOCA examination and invited him to participate in these training sessions. *See* A-267-68, ¶ 3. Plaintiff did attend many of the training sessions provided by the National Training Institute. *See* A-31-35, Reqs. 151-84; A-176-207; A-284-85; A-278, ¶ 9. To the extent Plaintiff failed to take advantage of the training provided by the National Training Institute, it was likewise, his own decision. *See* A-278, ¶ 9. Additionally, Plaintiff could have cured the deficiency in his qualifications by obtaining Property Maintenance and Housing Inspection certification some time between his termination in July 2001 and March 2002, when the Department made its final decision regarding whom to hire for the Housing Code Enforcement Supervisor position. *See* A-82; A-283, ¶ 20. However, Plaintiff did not even attempt to do so. *See* A-14, Req. 23; A-16, Req. 34; A-58-61; A-252, ¶ 8; A-283, ¶ 20. Therefore, Plaintiff himself is responsible for Defendants' decision not to re-hire him.

Plaintiff, thus, cannot establish any causal nexus between his race and the actions taken by

Defendants, which is one of the essential elements of a prima facie case of racial discrimination under Title VII. Consequently, Defendants are entitled to summary judgment on Plaintiff's Title VII claims.

**III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY HAD LEGITIMATE, NON-DISCRIMINATORY AND NON-PRETEXTUAL REASONS FOR ALL OF THEIR EMPLOYMENT DECISIONS REGARDING PLAINTIFF**

Even if Plaintiff is able to establish a prima facie case of reverse discrimination, he cannot succeed on his Title VII claims because Defendants had legitimate, non-discriminatory and non-pretextual reasons for all of the employment decisions they made with respect to Mr. Albanese. Defendants' reason for terminating Mr. Albanese on July 26, 2001 was that he had failed to obtain BOCA certification as a housing inspector after being given over two years, including reasonable extensions, to do so. *See* A-14, Reqs. 19-20; A-15, Reqs. 31-32; A-47-48; A-50; A-54; A-250, ¶ 3; A-269-72, ¶¶ 3-6, 8; A-275-79, ¶¶ 3-7, 10, 12. The fact that similarly situated minorities were also terminated by the Department if they failed to obtain BOCA certification by the applicable deadline, after being granted extensions for reasonable cause, demonstrates that Defendants' termination of Mr. Albanese for failure to meet the BOCA certification requirement was neither racially motivate nor pretextual. *See* A-26-29, Reqs. 115-23, 125-30, 133-36; A-144; A-146; A-148; A-150; A-151; A-155; A-158; A-162; A-164; A-279-80, ¶¶ 12-13.

Defendants also had legitimate, non-discriminatory and non-pretextual reasons for re-posting the Housing Code Enforcement Supervisor position after Plaintiff had reapplied for and was initially recommended for that position. The decision to re-post the position was a proper exercise of Defendant Starkey's discretion pursuant to 1 *Wilm. C.* § 40-128(2)(a). Section 40-128 of the City Code grants commissioners the discretion to order the re-posting of a position when there are fewer than three qualified candidates on the certification list. *See* 1 *Wilm.C.* § 40-128(2)(a), A-239; A-251, ¶ 6. Section 40-128 has been utilized by the City on numerous instances in the past, without regard to race, to obtain the re-posting of positions when there were fewer than three qualified candidates on the certification list. *See* A-244-45, ¶¶ 3-5; A-252-56, ¶¶ 9-18. Only two persons other than the Plaintiff applied for and were certified as eligible

-36-

to be interviewed for the Housing Code Enforcement Supervisor position, and one of those applicants later withdrew from the selection process. *See* A-16-18, Reqs. 35-38, 43, 48; A-63; A-65; A-71; A-80; A-250-51, ¶¶ 4-5; A-282-83, ¶ 19. Defendant Starkey decided to re-post the position so it could be advertised to reach a wider market of potential applicants, in an effort to find the person best-qualified for the position. *See* A-17, Reqs. 40-41; A-67; A-251, ¶ 6; A-283, ¶ 20. Commissioner Starkey's decision to re-post the position was a proper exercise of his discretion pursuant to 1 *Wilm. C.* § 40-128(2)(a) because there were fewer than three qualified candidates for the position.

After it was re-posted, the Housing Code Enforcement Supervisor position was ultimately awarded to Kevin Wilson. *See* A-18-19, Reqs. 52-54; A-82; A-84-85; A-252, ¶ 8; A-283, ¶ 20. The Department had legitimate, non-discriminatory and non-pretextual reasons for hiring Mr. Wilson instead of Mr. Albanese. The Department hired Mr. Wilson because he was the person most qualified for the position. He was the applicant with the highest overall score in the selection process, and he had already obtained the required BOCA certification in Property Maintenance and Housing Inspection. *See* A-17-18, Reqs. 45-47; A-73-78; A-80; A-82; A-84-85; A-252, ¶ 8; A-257-60; A-283, ¶ 20; A-287, ¶ 4; A-288-98.

Defendants had an additional legitimate, non-discriminatory and non-pretextual reason for terminating Plaintiff's employment as the Housing Code Enforcement Supervisor and refusing to rehire him for the same position. Plaintiff did not meet all of the qualifications required for the job. One of the necessary qualifications for the position of Housing Code Enforcement Supervisor was BOCA certification in Property Maintenance and Housing Inspection. *See* A-50; A-270-71, ¶ 6; A-276-77, ¶ 6. This qualification was required of all housing inspectors to protect the safety of the public and reduce the City's exposure to potential liability by ensuring that they were familiar with applicable housing and sanitation standards and were, thus, competent to perform their job duties. *See* A-269-70, ¶ 3; A-275-76, ¶ 3. Plaintiff's employment was terminated in July 2001 because of his failure to meet this essential qualification for his position. *See* A-15, Reqs. 31-32; A-52; A-54; A-250, ¶ 3; A-270-72, ¶¶ 6, 8; A-276-79, ¶¶ 6-7, 10,

12. Plaintiff had failed the BOCA Property Maintenance and Housing Inspection examination twice, after being given more than two years to obtain the required certification. *See* A-47-48; A-52; A-270-72, ¶¶ 4-6, 8; A-276-78, ¶¶ 4-7, 10. When Plaintiff re-applied for the Housing Code Enforcement Supervisor position in August 2001, he had **already** failed to meet one of the essential qualifications for the position–the requirement of obtaining BOCA certification in Property Maintenance and Housing Inspection within one year of achieving permanent employee status in that position. *See* A-52; A-58-61; A-250, ¶ 3; A-252, ¶ 8; A-276-79, ¶¶ 7, 10, 12; A-283, ¶ 20. He had not cured this deficiency in his qualifications by obtaining the required BOCA certification during the period between his termination and his reapplication for the same position. *See* A-14, Req. 23; A-47-48; A-58-61; A-252, ¶ 8; A-283, ¶ 20.

Furthermore, if Defendants had re-hired Mr. Albanese for the Housing Code Enforcement Supervisor position after he had been terminated from that same position for failure to obtain the required BOCA certification, it likely would have been viewed by other employees as a pre-text for allowing Mr. Albanese to circumvent the BOCA certification requirement. If the City were required to rehire Plaintiff after he **already** failed to obtain BOCA Property Maintenance and Housing Inspection certification within the one year period allowed, then this would create an endless cycle whereby the Plaintiff could perpetually reapply and be re-hired for the same position each and every year after having being terminated for failure to obtain the required BOCA certification within the one-year period after he was last re-hired. This would make a complete sham out of the BOCA certification requirement.

Defendants had legitimate reasons to be concerned that other employees might perceive them to be giving Mr. Albanese preferential treatment. Ironically, Arthur Walker, who is African American, later filed a charge of employment discrimination against the City, alleging that Mr. Albanese was given more favorable treatment with respect to the BOCA certification requirement in that Mr. Albanese's examination consisted of one component rather three, was less difficult, was paid for by the City and was given at a different facility; and Mr. Albanese supposedly received better training for the examination. *See* A-231. The Delaware

-38-

Office of Labor Law Enforcement ultimately determined there was no reasonable cause to believe the City

had discriminated against Mr. Walker, and Mr. Walker did not pursue the matter any further.  A-232-33.

Because Defendants had legitimate, non-discriminatory and non-pretextual reasons for the employment

decisions made with respect to Plaintiff, the Court should grant summary judgment in Defendants' favor.

**IV.    DEFENDANTS MOSLEY AND STARKEY ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY CANNOT BE HELD LIABLE FOR VIOLATIONS OF TITLE VII IN THEIR INDIVIDUAL CAPACITIES AS A MATTER OF LAW**

It is well settled that individual employees cannot be held liable under Title VII.  *Kachmar v.*

*Sungard Data Systems, Inc.*, 109 F.3d 173, 184 (3d Cir. 1997); *Sheridan v. E.I. DuPont de Nemours and Co.*,

100 F.3d 1061, 1077-78 (3d Cir. 1996).  As all of the claims raised in Plaintiff's Complaint are brought

pursuant to Title VII (*see* A-217-26), there can be no liability of Defendants Mosley and Starkey in their

individual capacities for any of Plaintiff's claims as a matter of law.   Defendants Mosley and Starkey are,

therefore, entitled to summary judgment.

**V.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES BECAUSE PUNITIVE DAMAGES ARE NOT AVAILABLE AGAINST A MUNICIPALITY UNDER TITLE VII AS A MATTER OF LAW**

Plaintiff's Complaint demands that punitive damages be awarded on all of the Plaintiff's claims.  *See*

A-222 ¶ 18, 224 ¶ 23, 226 ¶ 30.  However, punitive damages are not available in this case as a matter of law.

*See Blackshear v. Wilmington*, 15 F.Supp.2d 417, 430 and n.7 (D. Del. 1998).  In *Blackshear*, the District

of Delaware held that punitive damages are not available against a municipality for violations of Title VII.

*Id.*  Although 42 *U.S.C.*§ 1981a(a)(1) and (b)(1) provide that punitive damages are available against an

employer who violates Title VII , governmental subdivisions are specifically excluded from this statutory

provision.  *See* 42 *U.S.C.* § 1981a(a)(1) and (b)(1); *Blackshear*, 15 F.Supp.2d at 430 and n. 6 and 7.   42

*U.S.C.* § 1981a(b)(1) states, in relevant part, that "[a] complaining party may recover punitive damages under

this section against a respondent **(other than a government, government agency or political subdivision)**

. . . .  (Emphasis added.)  In *Blackshear*, 15 F.Supp.2d at 430 and n. 7,  the Court concluded that, as a

municipal corporation, the City of Wilmington is a governmental subdivision that is not subject to punitive damages for Title VII violations pursuant to 42 *U.S.C.* § 1981a(b)(1).

All of the Plaintiff's claims in this case are brought pursuant to Title VII. (*See* A-217-26). Because punitive damages are not available against a municipality under Title VII as a matter of law, and Defendants Mosley and Starkey cannot be liable under Title VII in their individual capacities, Defendants are entitled to summary judgment on Plaintiff's punitive damages claims.

## VI. PLAINTIFF'S DAMAGES, IF ANY, ARE LIMITED TO A MAXIMUM OF $300,000

Plaintiff's damages, if any, are limited to a maximum of $300,000 pursuant to 42 U.S.C. § 1981a(b)(3)(D). The maximum permissible amount of damages awarded in a Title VII employment discrimination case against an employer such as the City of Wilmington which has more than 500 employees is $300,000. *See* 42 *U.S.C.* § 1981a(a)(1) and (b)(3); *Blackshear*, 15 F.Supp.2d at 430 (construing 42 *U.S.C.* § 1981a(b)(3)); A-242 ¶ 2. Although Defendants maintain they are not liable under Title VII and Plaintiff is, therefore, not entitled to any damages for the reasons explained above, if the Court determines otherwise, Plaintiffs damages must be limited to a maximum of $300,000 pursuant to 42 *U.S.C.* § 1981a(b)(3)(D).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss the Plaintiff's Complaint with prejudice.

CITY OF WILMINGTON LAW DEPARTMENT

    /s/ Andrea J. Faraone
Andrea J. Faraone (#3831)
Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants

-40-